**INTELLECTUAL VENTURES I LLC and Intellectual Ventures II LLC, Plaintiffs,**

v.

**SYMANTEC CORPORATION and Veritas Technologies LLC, Defendants.**

**CA. No. 13–440–LPS**

United States District Court, D. Delaware.

Signed February 13, 2017

---

31. The court declines to summarize the testimony herein.

Joseph J. Farnan III and Brian E Farnan, FARNAN LLP, Wilmington, DE, Ian M. Gore, SUSMAN GODFREY L.L.P., New York, NY, Parker C. Folse III, Daniel J. Shih, and E. Lindsay Calkins, SUSMAN GODFREY L.L.P., Seattle, WA, Richard W. Hess, SUSMAN GODFREY L.L.P., Houston, TX, Attorneys for Plaintiffs.

Karen Jacobs and Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE, Dean G. Dunlavey, LATHAM & WATKINS LLP, Costa Mesa, CA, Douglas E. Lumish and Lisa K. Nguyen, LATHAM & WATKINS LLP, Menlo Park, CA, Gabriel K. Bell, LATHAM & WATKINS LLP, Washington, DC, Attorneys for Defendants,

REDACTED—PUBLIC VERSION

## MEMORANDUM OPINION

STARK, U.S. District Judge:

## I. BACKGROUND

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "IV") brought this patent-infringement suit against Defendants Symantec Corporation and Veritas Technologies (collectively, "Symantec"). IV asserts that Symantec's VVR product infringes claims 25 and 33 of U.S. Patent No. 5,537,533 (*see* D.I. 297 at 2 & n. 1), which describes and claims a system for remote mirroring of digital data from a primary server to a remote server.

Pending before the Court are the parties' motions for summary judgment and motions to exclude portions of expert testimony. The Court heard oral argument on the pending motions on January 3, 2017. (*See* D.I. 332 ("Tr.")) A jury trial is scheduled for April 10, 2017. For the reasons stated below, the Court will grant Symantec's motions for summary judgment of patent ineligibility, non-infringement, and no willful infringement and IV's motion for summary judgment on Symantec's prosecution history estoppel and waiver defenses. The Court will deny all other motions.

## II. LEGAL STANDARDS

### A. Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

An assertion that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for· purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse.party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and· it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, Conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## B. Patent–Eligible Subject Matter

Under 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." There are three exceptions to § 101's broad patent-eligibility principles: "laws of nature, physical phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 309, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980). Pertinent here is the third category, "abstract ideas," which "embodies the longstanding rule that an idea of itself is not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, —— U.S. ——, 134 S.Ct. 2347, 2355, 189 L.Ed.2d 296 (2014) (internal quotation marks omitted). "As early as *Le Roy v. Tatham*, 55 U.S. (14 How.) 156, 175, 14 L.Ed. 367 (1852), the Supreme Court explained that '[a] principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right.' Since then, the unpatentable

nature of abstract ideas has repeatedly been confirmed." *In re Comiskey*, 554 F.3d 967, 977–78 (Fed. Cir. 2009).

In *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012), the Supreme Court set out a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S.Ct. at 2355. First, courts must determine if the claims at issue are directed to a patent-ineligible concept—in this case, an abstract idea ("step 1"). *See id.* If so, the next step is to look for an " 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself" ("step 2"). *Id.* The two steps are "plainly related" and "involve overlapping scrutiny of the content of the claims." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

### 1. *Mayo* Step 1

■ At step 1, "the claims are considered in their entirety to ascertain whether their character *as a whole* is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015) (emphasis added); *see also Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter.").

■ Courts should not "oversimplif[y]" key inventive concepts or "downplay" an invention's benefits in conducting a step–1 analysis. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016); *see also McRO, Inc. v. Bandai Namco*

*Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. Sept. 13, 2016) ("[C]ourts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims.") (quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)). "Whether at step one or step two of the *Alice* test, in determining the patentability of a method, a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps." *McRO*, 837 F.3d at 1313.

### 2. *Mayo* Step 2

■ At step 2, courts must "look to both the claim as a whole and the individual claim elements to determine whether the claims contain an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *McRO*, 837 F.3d at 1312 (internal brackets and quotation marks omitted). The "standard" step–2 inquiry includes consideration of whether claim elements "simply recite 'well-understood, routine, conventional activit[ies].' " *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (quoting *Alice*, 134 S.Ct. at 2359). "Simply appending conventional steps, specified at a high level of generality, [is] not *enough* to supply an inventive concept." *Alice*, 134 S.Ct. at 2357 (internal quotation marks omitted).

■ However, "[t]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *Bascom*, 827 F.3d at 1350. In *Bascom*, the Federal Circuit held that "the limitations of the claims, taken individually, recite generic computer, network and Internet components, none of which is inventive by itself," but nonethe-

less determined that an *ordered combination* of these limitations was patent-eligible under step 2. *Id.* at 1349. The Federal Circuit has looked to the claims as well as the specification in performing the "inventive concept" inquiry. *See Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1271 (Fed. Cir. 2016) ("[N]either the claim nor the specification reveals any concrete way of employing a customized user interface.").

■ The "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention" under step 2. *Alice*, 134 S.Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Id.*

### C. Motions to Exclude

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court explained that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Rule 702 requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert testimony is admissible only if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d).

■ There are three distinct requirements for proper expert testimony: (1) the expert must be qualified; (2) the opinion must be reliable; and (3) the expert's opinion must relate to the facts. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

## III. DISCUSSION

### A. Cross–Motions for Summary Judgment on Patent–Eligible Subject Matter (D.I. 275, 276)

■ Symantec moves for summary judgment that the asserted claims, claims 25 and 33 of the '533 patent, are not directed to patent-eligible subject matter. (*See* D.I. 278 at 1) IV moves for summary judgment that the asserted claims are directed to patent-eligible subject matter. (*See* D.I. 277 at 11)

Independent claim 25 reads;

25. A method for remote mirroring of digital data, said method comprising the steps of:

copying the data from a primary network server to a nonvolatile data buffer in a data transfer unit which is digitally connected to the primary network server, the primary network server including an operating system which is capable of accessing a nonvolatile server store, the data copied to the data transfer unit being a substantially concurrent copy of data which is being stored by the operating system in the nonvolatile server store of the primary network server;

copying the data from the data transfer unit to an input end of a communication link which has an output end physically separated from its input end;

generating and sending a spoof packet to the operating system of the primary network server; and

copying the data from the output end of the communication link to a nonvolatile server store on a remote network server.

'533 patent col. 17 II. 27–46. Claim 33, which depends from claim 25, adds:

compressing the data prior to said step of copying the data from the data transfer unit to the input end of the communication link; and

decompressing the data after said step of copying the data from the output end of the communication link.

Col. 18 ll. 49–56.

IV argues that the claims are not directed to an abstract idea but are instead "a precise, innovative, and technical solution to the problem of protecting critical data during power interruptions or system reboots." (D.I. 277 at 14) That solution, according to IV, involves "the use of nonvolatile data stores and the transmission of spoof packets to ensure that data copying can be continued in the event of interruptions in power or other events threatening data integrity." (*Id.* at 15) Thus, IV contends that the claimed invention is not directed to an abstract idea because it is an improved system of copying data. (*See id.* at 16)

Symantec counters that the claims "are directed to the basic abstract idea of storing an up-to-date backup copy of data at a remote location." (D.I. 278 at 6) Symantec contends that this "is the sort of thing that humans have done for centuries, even before computers." (*Id.* at 7) Further, according to Symantec, the claims' invocation of computers is not as " 'an improvement in computers as tools,' " but simply " 'use[s] computers as tools' " to carry out the abstract idea of backing up data. (*Id.* at 10) (quoting *Elec. Power*, 830 F.3d at 1354).

Considering the claims as a whole, *see Alice*, 134 S.Ct. at 2355 n.3, the Court agrees with Symantec that the focus of the claims is the abstract idea of backing up data. The claims recite the basic steps of copying data from one location to another several times and sending a confirmation that the data has been received. *See* '533 patent col. 17 ll. 27–46. It is undisputed

that institutions have long backed up data in general (*see* D.I. 278 at 7), and the specification even describes long-practiced methods of backing up digital data, *see* '533 patent col. 11. 57–col. 41. 32. Additionally, courts have found similar claims—about storing or copying information—as being within the realm of abstract ideas. *See, e.g., Elec. Power*, 830 F.3d at 1353; *Internet Patents*, 790 F.3d at 1347; *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014).

It is true, as IV observes, that the specification identifies several disadvantages of the prior art back-up methods. IV, analogizing to *Enfish* and *McRO*, contends that this demonstrates that the claims are directed to a specific technological solution— "[a] method for remote mirroring of digital data," col. 171. 27—that improves upon the prior art methods. (*See* D.I. 299 at 6–7) But the claims do not support IV's contention. The claims do not provide any concrete details that limit the claimed invention to a specific solution to the problem of remote back-up of digital data. *See Affinity Labs*, 838 F.3d at 1269. The claims simply rely on functional language to describe copying and confirmation steps. *See TLI*, 823 F.3d at 612. Additionally, the claims use existing computer functionality as a tool to better back up data and do not themselves purport to improve anything about the computer or network itself. *See Elec. Power*, 830 F.3d at 1354. Thus, unlike *Enfish* and *McRO*, the claims do not improve the way computers store information or otherwise function. Rather, the claims rely on the ordinary storage and transmission capabilities of computers within a network and apply that ordinary functionality in the particular context of remote mirroring. *See FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir.

2016). The specification's insistence that the claimed invention is an "advancement" over the prior art does not overcome the Court's conclusion that the **claims as written** focus on an abstract idea. *See Elec. Power*, 830 F.3d at 1354; '533 patent col. 4 II. 32–55. Claim 33's additional compression and decompression steps do nothing to change this conclusion.

■ The Court, therefore, must search the claim limitations, individually and as an ordered combination, for an "inventive concept." *See Alice*, 134 S.Ct. at 2355. The Court agrees with Symantec that the claims lack anything sufficient to transform the abstract idea into patent-eligible subject matter.

The claims invoke conventional computer components that do not supply an inventive concept, and IV does not seriously contend otherwise. *See Tr.* at 19. The specification confirms that the individual components, such as a "network server," "nonvolatile data buffer," and "communication link," are conventional, generic, and operate as expected. *See, e.g.,* '533 patent col. 511. 28–29 ("conventional communication link"); col. 511. 34–35 ("server then stores the remotely mirrored data in a conventional manner"); col. 611. 60–61 ("conventional client-server network"); col. 11 II. 12–13 ("preferred nonvolatile buffer [ ] is a conventional magnetic hard disk drive"). Courts "have repeatedly held that such invocations of computers and networks that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea." *Elec. Power*, 830 F.3d at 1355 (quoting *buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350, 1353, 1355 (Fed. Cir. 2014)).

IV contends that when considered as an ordered combination, the claims provide "specific, claimed limitations of using a nonvolatile data store and sending the spoof packet prior to undertaking a data write ... [that] transform any alleged abstract idea into 'a particular, practical application of that abstract idea.' " (D.I. 277 at 17) (quoting *Bascom*, 827 F.3d at 1352) But beyond insisting that the combination is "critical" to "improving data retention and system performance" (D.I. 277 at 17–18; *see also* D.I. 299 at 9–13), IV does not describe how these components function in combination in an arguably inventive way or what it may be about this arrangement of components that engenders the alleged improvement, and the claims provide little guidance. To the extent that claim 25 requires a specific ordering of events—sending a spoof packet **before** performing the final copying step—Symantec provides evidence that this order was known and conventional (*see* D.I. 304 Ex. 8 at ¶ 1691), which IV does not challenge, either in its briefing (*see* D.I. 317 at 2–5) or with expert testimony (*see* D.I. 304 Ex. 1 at 213).

With respect to claim 33, IV asserts that the added compression and decompression steps are inventive because they "provide[ ] functionality that would allow more data to be transferred more quickly," (D.I. 299 at 10) However, the record contains no indication there is anything unconventional about data compression, and the claim does not purport to implement an improvement in compression technology. *See TLI*, 823 F.3d at 615. Accordingly, claims 25 and 33 of the '533 patent fail to recite any inventive concept sufficient to elevate them into patent-eligible applications of the abstract idea of backing up data.

At most, the '533 patent identifies a problem in the prior art: available methods for backing up digital data were insufficiently reliable for mission-critical data, because the copies were not substantially current. *See* '533 patent col. 11. 19—col. 41, 32. But the patent's claimed solution merely restates the problem to provide "a method for remote mirroring of digital data," in which "the data copied" is "a

substantially concurrent copy." Col. 17 II. 27, 34–35. Such attempt to claim "the abstract idea of a solution to the problem in general," as opposed to a particular solution, confirms the patent ineligibility of these claims. *Elec. Power*, 830 F.3d at 1356. Accordingly, the Court will grant Symantec's motion for summary judgment of patent ineligibility and deny IV's cross-motion.

**B. Symantec's Motion for Summary Judgment of Non–Infringement (D.I. 280)**

**1. "Substantially concurrently"**

■ Symantec moves for summary judgment of non-infringement on the basis that VVR does not write data into the nonvolatile server store of the primary network server and a nonvolatile data buffer in a data transfer unit "substantially concurrently," as required by the asserted claims. (*See* D.I. 283 at 1–2)

During claim construction, the Court adopted IV's proposed construction of "substantially concurrent," construing the term to mean "not separated in time except as a result of processing delays." (D.I. 214 at 7) In its construction, the Court accepted IV's argument that the term "is a causal limitation, intended to distinguish between delays that are designed into the system and delays that merely reflect the time needed to process the data being copied." (*Id.* at 7) Thus, the Court agreed with IV that "whether the length of delay meets the limitation can be ascertained by reference to the cause of delay." (*Id.* at 8)

Applying the Court's construction, Symantec now argues that its product, VVR, does not meet this limitation because it is undisputed that VVR is designed to write data to the nonvolatile data buffer in a data transfer unit (in VVR called a "storage replicator log" or "SRL") *before* writing to the nonvolatile server store of the primary network server, with a pro-

grammed delay between those write steps, (*See* D.I. 283 at 8) According to Symantec, "[t]he separation between the write to SRL and write to primary is not the result of unavoidable processing delay; VVR is designed such that the write to the SRL is completed before the write to the primary data volumes begins." (*Id.*) Symantec explains that the copying steps are intentionally separated by a step to set up the write to the remote volumes. (*See id.* at 12–13) Symantec contends that even IV's technical expert, Mr. Webster, confirms that this is how VVR operates. (*See id.* at 10–13) Hence, the delay between the write steps is a design choice, not simply the time needed to process data, and therefore the accused product does not operate in a way that meets the "substantially concurrent" limitation. (*See id.* at 10–11)

IV opposes summary judgment. IV does not dispute Symantec's description of how VVR works. Instead, IV contends that Symantec's non-infringement position erroneously equates "substantially concurrent" with "simultaneous." (*See* D.I. 297 at 4–6) IV also contends that VVR meets the "substantially concurrent" limitation because the only delays between the two writes are processing delays. (*See id.* at 6–7) According to IV, "the set up to the remote *is* part of VVR's data processing," and "[l]eaving out the step of setting up the write to the remote volumes would eliminate the entire purpose of VVR, which is maintaining data integrity in the event of system failure." (*Id.* at 6–7) IV acknowledges that the write order of VVR involves some design choices, but nevertheless maintains that "this does not alter the fact that the writes in VVR occur 'substantially concurrently' under this Court's construction because they are only separated in time by processing delays." (*Id.* at 7)

The Court agrees with Symantec. On the record before the Court, taken in the light most favorable to IV and drawing all reasonable inferences in IV's favor, no reasonable juror could find that Symantec's accused VVR product copies to a data transfer unit a "substantially concurrent" copy of data being stored on the primary network server, as the Court has construed that term. There is no genuine dispute of material fact regarding the operation of VVR. VVR first writes data to the SRL, which is the component identified as the nonvolatile data buffer in a data transfer unit. (*See* D.I. 287 Ex. 5 at ¶¶ 74–75; Ex. 7) When the write to the SRL is completed, VVR executes code to set up the write to the remote servers. (*See* D.I. 287 Ex. 5 at ¶ 76; Ex, 8 at 183, 186–93) After the write to the remote servers is set up, VVR begins the write to the primary data volume. (*See* D.I. 287 Ex. 5 at ¶¶ 76–77; Ex. 8 at 183) Therefore, the write to the SRL and the write to the primary data volume undisputedly are separated by a step, setting up the write to the remote servers. Thus, there are "delays between the [write to SRL and write to primary] steps beyond what is necessary for the system to process those steps." (D.I. 94 at 17)

In arguing against this conclusion, IV argues that the remote-write setup is merely a processing delay. But IV's expert confirmed that it would have been possible to design VVR without this intervening step. (*See* D.I. 287 Ex. 8 at 183–84) Hence, any delay caused by that setup step cannot be attributed to some necessary data-processing step. (*See* D.I. 94 at 18) ("Such delays are not 'processing delays' because they are unrelated to what is necessary for the system to process those steps.") IV also contends that because "VVR's actual design … relies on the processing order of setting up the remote writes before writing to the primary in order to ensure that data is retained in the event of a

systemic disruption." the delay must be a processing delay. (D.I. 297 at 7; *see also* D.I. 287 Ex. 8 at 183–84) But, under this theory of "processing delays," every design choice made in programming the system results in merely a processing delay.

IV previously persuaded the Court that whether the write steps are "substantially concurrent" can de determined by the cause of the delay—whether they "are designed into the system" or "merely reflect the time needed to process the data being copied." (D.I. 214 at 7–8) IV cannot now distance itself from the claim construction it proposed. The delay caused by the remote-write setup is *designed* into the system and, therefore, is not a processing delay. That VVR may operate more effectively as a result of this particular design choice does not persuade the Court otherwise. (*See* Tr. at 35)

Accordingly, the Court will grant Symantec's motion for summary judgment of non-infringement.

### 2. No Proof of Direct Infringement

 In the alternative, Symantec argues that the Court should grant summary judgment of non-infringement because IV has failed to proffer any evidence of direct infringement. The asserted claims are method claims, so "sales of [the accused] software alone cannot infringe the patent. Infringement occurs only when someone performs the method using a computer running the necessary software." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009). "[I]t is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010). Circumstantial evidence can be sufficient to prove infringement of a method claim. *See Lucent*, 580 at 1318–19.

Contrary to Symantec's assertion, IV has proffered circumstantial evidence of customer use of VVR. IV's evidence includes a customer support call database that documents customer issues regarding VVR, maintenance packages purchased by customers for VVR, and testimony of Symantec's corporate representative about two customers using VVR in some capacity. (*See* D.I. 297 at 8) With respect to the compression feature of claim 33, IV points to evidence and testimony of a Symantec employee to show that Symantec enabled compression in VVR, and did so because its customers requested that feature. (*See id.* at 10) Hence, there is sufficient evidence from which a reasonable jury could find that at least one Symantec customer used VVR during the relevant time, making summary judgment of non-infringement inappropriate.

### C. Symantec's Motion for Summary Judgment of No Damages (D.I. 280)

■■■■ Symantec moves for summary judgment of no damages, Symantec argues that even assuming some customers installed and used VVR during the damages period, IV has not provided a basis to quantify the number of customers who did and, therefore, IV's damages claim is entirely speculative. (*See* D.I. 283 at 16–18; D.I. 319 at 10) A patentee "can only receive infringement damages on those devices that actually performed the patented method during the relevant infringement period." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1359 (Fed. Cir. 2009). The patentee, however, is not "required to demonstrate a one-to-one correspondence between units sold and directly infringing customers." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 1 Fed.Appx. 879, 884 (Fed. Cir. 2001).

IV's damages theory rests on the assumption that all, or nearly all, of the customers who purchased VVR did, in fact, use it. To support that assumption, IV points to evidence showing that [Redacted]. IV's expert opines that, given the price and budgetary pressures on IT departments, "[i]t would be unreasonable for any corporate or individual customer to spend [Redacted] on a product they *never* used." (D.I. 297 at 11) (citing D.I. 298 Ex. 15 at ¶ 256, Ex. 16 at ¶ 64)

IV has identified sufficient evidence from which a jury could reasonably equate purchase of VVR with actual use of the product.

### D. Symantec's Motion for Summary Judgment of No Enhanced Damages (D.I. 280)

■■■ IV's willfulness theory is based solely on the assertion that Symantec had pre-suit knowledge of the '533 patent, because this patent is cited on the face of two patents owned by Symantec. (*See* D.I. 283 at 20) According to IV, "Symantec either prosecuted or acquired both patents prior to the instant lawsuit's filing, and both patents reference the '533 patent." (D.I. 297 at 14) At summary judgment, this evidence alone is not sufficient to conclude Symantec had knowledge of the patent for willfulness purposes. *See Radware, Ltd. v. F5 Networks, Inc.*, 2016 WL 4427490, at *4 (N.D. Cal. Aug. 22, 2016) ("[D]istrict courts have ruled that mere citation to a patent number in correspondence from the Patent Office is legally insufficient to support a finding of willfulness."); *Spherix Inc. v. Juniper Networks, Inc.*, 2015 WL 1517508, at *3 (D. Del. Mar. 31, 2015); *Chalumeau Power Sys. LLC v. Alcatel–Lucent*, 2012 WL 6968938, at *1 (D. Del. July 18, 2012); *Cordance Corp. v. Amazon.com Inc.*, 639 F.Supp.2d 406, 412–16 (D. Del. 2009).

Furthermore, even were the Court to accept that Symantec had knowledge of

the '533 patent, pre-suit knowledge alone is not sufficient to support a finding of willful infringement. *See Greatbatch Ltd. v. AVX Corp.*, 2016 WL 7217625, at *3 (D. Del. Dec. 13, 2016); *Dorman Prod., Inc. v. Paccar, Inc.*, 201 F.Supp.3d 663, 681–82, 2016 WL 4440322, at *9 (E.D. Pa. Aug. 23, 2016). IV argues that in addition to pre-suit knowledge, enhanced damages are warranted because "Symantec has continued to update, produce, and sell VVR even [after] this suit was filed in March 2013." (D.I. 297 at 14) But IV identifies no evidence of behavior beyond typical infringement. No reasonable jury could find willful infringement based on IV's evidence.

Therefore, the Court will grant Symantec's motion for summary judgment of no willful infringement.

### E. Remaining Motions

Having granted Symantec's motion for summary judgment of patent ineligibility and non-infringement, the Court will deny without prejudice IV's motion for partial summary judgment on Symantec's laches defense (D.I. 275), IV's motion to preclude opinions of Symantec's damages expert W. Christopher Bakewell (D.I. 281), and Symantec's motion to preclude the testimony of IV's damages expert Michael Wagner (D.I. 285).[1]

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Symantec's motions for summary judgment of patent ineligibility, non-infringement, and no willful infringement, as well as IV's motion for summary judgment on Symantec's prosecution history estoppel and waiver defenses, and will

---

1. IV also moves for summary judgment on Symantec's prosecution history estoppel and waiver defenses (D.I. 275), which Symantec

deny all other motions. An appropriate Order follows.

does not oppose (*see* D.I. 300 at 1 n.1). Accordingly, the Court will grant IV's motion for summary judgment on these defenses.